# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-146V**
UNPUBLISHED

| | |
|---|---|
| JOEL MILES, <br><br>                 Petitioner, <br><br> v. <br><br> SECRETARY OF HEALTH AND <br> HUMAN SERVICES, <br><br>                 Respondent. | Chief Special Master Corcoran <br><br> Filed: November 28, 2022 <br><br> Special Processing Unit (SPU); <br> Damages; Influenza (Flu) Vaccine; <br> Guillain-Barre Syndrome (GBS) |

*Jerome A. Konkel, Samster, Konkel & Safran, S.C., Milwaukee, WI, for Petitioner.*

*Sarah Black Rifkin, U.S. Department of Justice, Washington, DC, for Respondent.*

## DAMAGES DECISION[1]

On February 11, 2020, Joel Miles filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, et seq. (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to him on March 16, 2017. Petition at 3. The case was assigned to the Special Processing Unit of the Office of Special Masters, and an entitlement ruling in favor of Petitioner was issued on November 21, 2020. ECF No. 20. The parties were unable to resolve damages on their own, however.

For the reasons detailed herein, I award damages in the total amount of **$196,537.15, representing $192,500.00 for Petitioner's actual pain and suffering, and $4,037.15 for unreimbursed expenses.**

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

## I.      Relevant Procedural History

Following Respondent's concession on November 9, 2020, I issued an entitlement ruling in favor of Petitioner on November 21, 2020. ECF No. 19; ECF No. 20. A damages order was issued the same day. ECF No. 21. When settlement discussions stalled in this matter, briefing on damages, expert reports, and supporting documents were ordered. *See* ECF No. 34; Scheduling Order (Non-PDF), issued September 9, 2021.

On November 24, 2021, Petitioner filed a motion for ruling on the record on the issue of damages, along with an expert report and supporting documents. ECF Nos. 35-36. Petitioner requested $250,000.00 for pain and suffering, $19,616.16 for future medical expenses, and $7,976.63 for unreimbursed expenses. ECF No. 36 at 1. Respondent filed his brief and expert report, submitting that $192,500.00 would be appropriate for pain and suffering and $3,280.92 for unreimbursed expenses. ECF No. 38. Respondent specified that compensation had only been conceded for Petitioner's initial March 2017 episode of GBS; Petitioner's subsequent GBS recurrence two years later was too far removed in time to be vaccine-related, and therefore should not be factored in the damages calculation. *See id.* at 1, 14-15. Both parties filed additional replies reiterating their respective positions, though Petitioner reduced his request for future medical expenses to $5,801.60. ECF No. 46 at 1, 5; ECF No. 47.

The issue of damages is now ripe for adjudication.

## II.     Legal Standards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation ... determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula");

*Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims.[2] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

## III.   The Parties' Arguments

Citing six[3] prior damages determinations that Petitioner alleges involved GBS injuries less severe than here, resulting in lower awards ($175,000-$180,000), Petitioner

---

[2] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[3] *Johnson v. Sec'y of Health & Human Servs.*, 16-1356V, 2018 WL 5024012, *2-3 (Fed. Cl. Spec. Mstr. July 20, 2018) ($180,000.00 in pain and suffering: one round of IVIG, lumbar puncture, five-day hospital stay, 45 personal training sessions); *McCray v. Sec'y of Health & Human Servs.*, 19-0277V, 2021 WL 4618549, *3 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) ($180,000.00 in pain and suffering: one round of IVIG, lumbar puncture, MRIs, EMG, twelve-day hospital stay, 21-day inpatient rehabilitation, one month of physical therapy); *Fedwa v. Sec'y of Health & Human Servs.*, 17-1808V, 2020 WL 1915138, *9 (Fed. Cl. Spec. Mstr. March 26, 2020) ($180,000.00 in pain and suffering: five rounds of IVIG, lumbar punctures, EMGs, eight-day hospital stay, five-day inpatient rehabilitation, three months of physical therapy); *Presley v. Sec'y of Health & Human Servs.*, 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. March 23, 2020) ($180,000.00 in pain and suffering: four rounds of IVIG, several lumbar puncture attempts, eight-day hospital stay, rehabilitation limited by Medicaid, long residual affects); *Dillenbeck v. Sec'y of Health & Human Servs.*, 17-1488V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) ($170,000.00 in pain and suffering: multiple rounds of IVIG, fourteen-day hospital stay, 5-day inpatient rehabilitation, one month of physical therapy); *Devlin v. Sec'y of Health & Human Servs.*, 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. August 7, 2020) ($180,000.00 in pain and suffering:  seven courses of plasmapheresis; lumbar puncture, EMG, twelve-day hospital stay, two months of physical therapy and gym rehabilitation).

requests $250,000.00 – the largest sum available under the Program's "cap." ECF No. 36 at 23. Petitioner submits that his initial episode of GBS included paralysis from the waist down, incontinence, hospitalizations, IVIG treatment, plasmapheresis, inpatient and outpatient rehabilitation, deep vein thrombosis, and bilateral foot drop. *Id.* at 21-23. Petitioner later suffered a second episode of GBS - from February 14, 2019 through March 1, 2019 - which he maintains was also "caused by the March 16, 2017 flu vaccine." ECF No. 46 at 4. The second episode again involved IVIG, physical therapy, incontinence, and paralysis. ECF No. 36 at 23. Petitioner acknowledges vomiting on February 10, 2019 but asserts that he did not have a gastrointestinal infection. ECF No. 46 at 4. Dr. Derek Smith, Petitioner's expert, also opines that gastroparesis, which can lead to vomiting, is not uncommon for a person with a history of diabetes. *Id.* Furthermore, Petitioner submits that his treating physicians in February 2019 and thereafter concluded that he suffered from recurrent GBS even with knowledge of prior his vomiting. *Id.*

Petitioner thus maintains overall that he experienced a "severe and protracted course of GBS that establishes entitlement to the maximum pain and suffering award." ECF No. 46 at 24. Petitioner distinguishes his case from *Wilson*,[4] which resulted in a $175,000 pain and suffering award. According to Petitioner, the *Wilson* petitioner "had dramatic improvement within 5 months from onset" and "regained full strength and motor function within 10 months from onset," whereas Petitioner in this matter underwent "nearly two full years of treatment, hospitalizations, and suffering." *Id.* at 2-3. "Petitioner experienced more time related to his treatment for his *first* bout of Guillain-Barre Syndrome than the petitioner's entire course of treatment in *Wilson*." *Id.* at 3. Petitioner additionally requests a total of $7,976.63 in out-of-pocket costs ($4,738.13 being spent from the date of the vaccination until the February 14, 2019 hospitalization, and $3,238.50 being expenses from the date of the February 14, 2019 hospitalization to the present) and $5,801.60[5] for future medical expenses. *Id.* at 1, 5.

Respondent submits that $192,500.00 is appropriate compensation for Petitioner's pain and suffering. ECF No. 38. Respondent acknowledges that as a result of the vaccination at issue, Petitioner underwent "two weeks of hospitalization, including

---

[4] *Wilson v. Sect'y of Health & Human Servs.*, No. 20-588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021) ($175,000 in pain and suffering: one round of plasmapheresis; lumbar puncture, imaging, fourteen-day hospital stay, 33-day inpatient rehabilitation, five months of physical therapy, three months of occupational therapy, short residuals length).

[5] Petitioner initially requested $19,616.16 for future medical expenses. ECF No. 36 at 1, 24. This amount was based on Petitioner's annual medication cost of $1,022.76 and annual follow-up visit of $203.00, for the next sixteen years as estimated according to Social Security Administration life tables. *Id.* at 23-24. Petitioner ultimately requests $5,801.60 for future medical expenses. "In 2021, Petitioner incurred medical expenses in the amount of $159.601 and had an annual follow up visit with his physician that costed $203.00. As such, future unreimbursed expenses are $5,801.60, which is $362.60 and multiplying it by Petitioner's life expectancy, 16 years." ECF No. 46 at 7.

catheterization, one round of IVIG treatment, multiple weeks of in-patient rehabilitation, and thirty-eight sessions of outpatient therapy," but submits that such a course is reasonable, and not severe, for GBS. *Id.* at 13. Respondent cites similar cases to Petitioner, including *Wilson*, as most comparable. *Id.* at 14. "No two cases are identical but, on balance, petitioner's pain and suffering was roughly equivalent or only slightly worse than Mr. Wilson's." ECF No. 47 at 7.

Respondent further submits that as his expert, Dr. Brian Callaghan, opines, "there is no evidence linking the influenza vaccination with recurrent GBS 2 years later." ECF No. 38 at 15. Rather, it likely has an unrelated explanation. Respondent highlights that Petitioner reported four episodes of vomiting ten days prior to February 14, 2019. ECF No. 47 at 2, 3 (citing Ex. 10 at 87). Petitioner reported this information when seeking treatment from a neuromuscular specialist, who then "concluded that petitioner had experienced two different acute events in March of 2017 and February 2019." *Id.* at 3-4 (citing Ex. 18 at 25-28). As a result, Petitioner's recurrence of GBS was likely to have been caused by a gastrointestinal infection, entitling him only to pain and suffering associated with his initial March 2017 GBS episode.[6] *Id.* at 4.

Furthermore, Respondent submits that $3,280.92 is the proper amount for past unreimbursed expenses, which only includes costs related to the first GBS episode. ECF No. 38 at 16. Respondent cites Petitioner's demand submitted in February and April of 2021 as the proper amount; Petitioner's ultimate request, according to Respondent, includes "medical treatment unrelated to the first GBS episode." *Id.* Respondent argues against any future expenses, stating that "any continuing sequella (sic) that petitioner may experience is similarly unrelated to the vaccination." *Id.* at 17. Even if the second GBS episode is deemed to be related and compensable, Respondent argues that Petitioner "has not provided any evidence of continuing sequella (sic) of GBS that would warrant an award of future medical expenses." *Id.*

## IV. Damages

### A. Parameters of Petitioner's Compensable Injury

The principal issue in this matter is whether Petitioner's February 2019 GBS recurrence was a residual effect of Petitioner's initial GBS in March 2017 – and thus whether it was the result of the subject vaccination. Although Petitioner's position and the

---

[6] In his Rule 4(c) Report, Respondent states that "this second episode of GBS was too far removed in time, approximately two years following the flu vaccination, to satisfy a Table GBS [claim]." ECF 19 at 10. However, Petitioner need not show that his February 2019 GBS episode is in fact a Table GBS claim to claim damages for it. Petitioner need only demonstrate by a preponderance of evidence that the February 2019 GBS was a residual effect and/or continuation of petitioner's already-conceded Table GBS claim.

unfortunate difficulties he has faced elicit sympathy, after consideration of the entire record I cannot find the two instances are connected to the same vaccination (other than the fact that both involved GBS).

I note the following facts relating to my determination:

- Petitioner received the subject flu vaccine in his right arm on March 16, 2017, while he was hospitalized for gastritis and diabetes mellitus. Ex. 2 at 1; *see* Ex.16 at 19. Petitioner's medical history included diabetes, hypertension, and mandibular cancer. Ex. 16 at 33.

- On March 26, 2017, Petitioner presented to the emergency room with bilateral leg pain, tingling, and weakness that started the day prior. He had difficulty walking. Ex. 4 at 4. Petitioner was discharged following a change in cholesterol medication. *Id.* at 6.

- On March 28, 2017, Petitioner presented to urgent care complaining progressively worsening bilateral leg and back pain. Ex. 19 at 16-17. He was admitted to the hospital and the next day he developed urinary retention that required catheterization. Ex. 3 at 1422. His gait was unsteady and stiff. *Id.* at 1401.

- On March 31, 2017, Petitioner was examined by a neurosurgeon, Dr. Mark Gardon, who noted bilateral leg pain, a history of peripheral neuropathy, an MRI showing degenerative changes, and potential diabetic amyotrophy. Dr. Gardon recommended a lumbar epidural steroid injection. Ex. 3 at 1408-9. Petitioner was evaluated by his pain management specialist, Dr. Ahmet Dervish. Though good strength and movement was noted when lying in bed, Petitioner's bilateral leg pain had not improved, and Petitioner had difficulty standing. *Id.* at 1409-10. Dr. Dervish concurred with the plan for a steroid injection. *Id.* at 1410-12. Petitioner received a lumbar epidural steroid injection on April 3, 2017. *Id.* at 1824.

- On April 4, 2017, Petitioner was evaluated by neurologist Dr. Shawn Witton. Ex. 3 at 1475. Petitioner's deep tendon reflexes were absent in both legs, and petitioner had bilateral leg 2/5 bilateral leg weakness. *Id.* at 1477-78. An EMG was ordered, which showed demyelination. Petitioner was assessed with potential AIDP or GBS. *Id.* at 1480-88. Five days of IVIG was ordered. *Id.* at 1485.

- Petitioner underwent five days (or one round) of IVIG treatment, April 7-11, 2017. Ex. 3 at 1485-1503. Dr. Aaron Bulbox, another neurologist, ordered three days of IV steroids, which was administered April 9-11, 2017. *Id.* at 1416, 1493, 1498, 1502. Petitioner was placed on a two-week prednisone taper at discharge. *Id.* at 1416.

- On April 11, 2017, Petitioner entered subacute rehabilitation with an AIDP diagnosis. Ex. 3 at 1420. Petitioner had a neurogenic bladder and he required catheterization. Ex. 5 at 13, 106. Petitioner could use a wheelchair but had difficulty tolerating much time in the wheelchair due to pain, was unable to stand, and had extreme leg pain. Ex. 3 at 2064; Ex. 5 at 230. Petitioner underwent physical therapy ("PT") and occupational therapy ("OT") between April 12, 2017 and May 10, 2017, completing 24 PT sessions and 22 OT sessions. Ex. 5 at 255, 274. Petitioner also completed a plasmapheresis regimen. Ex. 3 at 5405.

- On May 12, 2017, Petitioner was discharged from subacute rehabilitation and admitted into inpatient rehabilitation. Ex. 3 at 5587. He underwent daily physical and occupational therapy. *Id.* at 5587-5998. Petitioner developed deep vein thrombosis in his left leg on June 5, 2017 and received anti-coagulant shots every twelve hours for approximately three weeks. *Id.* at 5410-15, 5488, 5563. Bilateral footdrop was noted on June 6, 2017. *Id.* at 5839. Petitioner was discharged on July 7, 2017 with a GBS diagnosis. At discharge, Petitioner's pain was controlled, he was able to urinate without catheterization, and he could walk 135 feet with a 2-wheeled walker. *Id.* at 5405-5839.

- Petitioner began outpatient physical therapy on July 13, 2017. Ex. 7 at 9-11. He presented to his primary care physician ("PCP"), Dr. Kumar Akashdeep on July 19, 2017. Petitioner was able to walk using his walker, though he continued to have pain in his feet. Ex. 20 at 96. Petitioner returned to Dr. Whitton on September 26, 2017. Petitioner walked with a cane and had no leg pain, though he had some issues with his balance and limited strength. Overall, Petitioner reported feeling "greatly improved." Ex. 3 at 6623.

- Petitioner was discharged from out-patient physical therapy after 19 sessions on October 3, 2017. Ex. 17 at 221-29. He had 3/5 – 4/5 bilateral proximal lower extremity strength but felt that he had improved "60%." *Id.* at 223, 228.

- On November 3, 2017, Petitioner established care with a new PCP, Dr. Michael Aleksandrowicz, and was walking with a cane. GBS following vaccination was noted. Ex. 20 at 425. Petitioner was noted to be traveling to Oklahoma until March of 2018.

- Petitioner returned to Dr. Aleksandrowicz on March 23, 2018, for his annual visit. Ex. 20 at 440-44. He had no motor deficits, had full range of motion in all four extremities, normal gait without an assistive device, and symmetrical bilateral deep tendon reflexes. *Id.* at 444.

- On August 28, 2018, Petitioner began physical therapy for limitations he attributed to GBS, specifically his inability to walk longer distances. Ex. 17 at 234. He completed 21 physical therapy visits and was discharged on November 6, 2018. He reported increased endurance, 0/10 pain, 4/5 – 5/5 strength throughout his lower extremities, he did not need an assistive device, and overall felt "very much improved." *Id.* at 455-458.

- On February 14, 2019, Petitioner presented to the emergency room and was admitted with complaints of bilateral leg weakness and pain that began earlier that day. He reported four episodes of vomiting ten days before. Ex. 10 at 87, 159. Petitioner reported his prior GBS, and having been "hospitalized for 15 weeks." *Id.* at 88. In the next three days, Petitioner began experiencing severe abdominal pain with intermittent cramps and vomiting, constipation, weakness and numbness in his legs, fatigue, and urinary retention requiring catheterization. Ex. 10 at 243-48, 259, 322, 328-43, 357-402.  Petitioner was assessed with possible reoccurrence of GBS versus chronic inflammatory demyelinating polyradiculoneuropathy ("CIDP"), a relapsing-recurring peripheral neuropathy that somewhat overlaps GBS. *Id.* at 328, 577. A cerebrospinal fluid test on February 21, 2019 showed normal white cells and elevated protein (>300/µl). *Id.* at 822.

- Petitioner underwent five plasma exchanges between February 22, 2019, and February 26, 2019. Ex. 10 at 577-690. Petitioner then received three rounds of IVIG. *Id.* at 761, 967-70.

- On March 1, 2019, Petitioner was transferred to inpatient rehabilitation. He was then discharged to a skilled nursing facility on March 29, 2019. Ex. 6 at 4-6, 254, 457, 617-22, 1530-1754, 1755-2007.

- On April 3, 2019, Petitioner was admitted to a rehabilitation hospital and discharged on April 12, 2019. Ex. 8 at 10, 60-69, 84-91.

- On May 2, 2019, Petitioner began outpatient physical therapy for ankle weakness and his inability to walk long distances. Ex. 9 at 25. He attended eight physical therapy sessions and was discharged on May 22, 2019. He was able to ambulate with a walker. *Id.* at 24-27.

- Petitioner was referred to a neurologist and saw Dr. James Napier on June 25, 2019. After review of Petitioner's history, he expressed the opinion that CIDP was a possibility and recommended IVIG and plasmapheresis.[7] Ex. 3 at 6797-99. Petitioner was also referred to a neuromuscular specialist, Dr. Michael Collins. *Id.* at 6799.

- On August 8, 2019, Petitioner was evaluated by Dr. Collins and reported that his main complaint was fatigue; he no longer needed a cane to walk. Ex. 18 at 20. Dr. Collins completed an extensive review of Petitioner's history and examination of current condition. *Id.* at 17-21. He also noted that the "only heralding event in 2/19 was an episode of nausea and vomiting about ten days prior to the onset of symptoms." *Id.* at 21. Dr. Collins concluded that Petitioner had likely experienced two episodes (or a recurrence of) GBS, and thus he could not diagnose Petitioner with CIDP. *Id.* at 26. Dr. Collins noted that Petitioner reached nadir four days after symptoms onset, which is consistent with GBS, not CIDP. Petitioner was not recommended IVIG, plasmapheresis, or steroids. *See id.* 25-28.

- On March 24, 2020, Petitioner noted that his foot discomfort had resolved, and he had no weakness, though he had some imbalance while walking. Ex. 22 at 234-235.

- Petitioner went to the emergency room on June 7, 2020, reporting left leg weakness and mild pain for a week. Ex. 21 at 17. Petitioner was treated with intravenous muscle relaxant, ibuprofen, and gabapentin. His treaters did not feel that he had GBS again and was discharged home. *Id.* at 18-20.

In addition to his brief and expert report, Petitioner submitted two personal affidavits detailing the course of his 2017 and 2019 GBS episodes. ECF No. 36-1; Ex. No. 27. During his 2017 GBS hospitalization, he was "terrified" and had "severe pain throughout every day." ECF No. 36-1 ¶¶7, 9, 13, 17. When Petitioner was discharged to a health rehabilitation center (April 11, 2017 – May 12, 2017), he was wheelchair bound, had no strength, and experienced burning pain. *Id.* ¶¶17-18. He continued to suffer "extreme pain" during his next stay at inpatient rehabilitation (May 12, 2017 – July 7, 2017)

---

[7] Petitioner did not undergo IVIG treatment at this point. *See* Ex. 3 at 6819.

and had to self-catheterize, which was "uncomfortable, painful, and humiliating" and made him "angry and upset." *Id.* ¶¶22-23. When Petitioner developed deep vein thrombosis on June 5, 2017, the anti-coagulant shots administered were "very painful." *Id.* ¶23. He completed outpatient physical therapy sessions between July 13, 2017 and October 3, 2017, but continued to "suffer from shooting pains in [his] legs…rated as a '4'." *Id.* ¶29. Petitioner affirmed that he stopped taking pain medications in early 2018. *Id.* ¶30. Following twenty-one physical therapy sessions (August 28, 2018 – November 6, 2018), Petitioner could walk independently for short distances and his pain had improved. *See id.* ¶31. Petitioner carefully drove himself from Sturgeon Bay, Wisconsin to Wichita Falls, Texas in November 2018.[8] *See id.* ¶33.

Petitioner affirmed that he had not yet fully recovered from GBS in February 2019, experiencing continued fatigue, pain in his feet and legs, and decreased sensation of urgency for using the bathroom. *Id.* ¶32. He then experienced the onset of his second GBS episode on February 14, 2019. *Id.* ¶34. In his supplemental affidavit dated January 3, 2022, Petitioner explained that he "experienced nausea and vomited" on February 10, 2019, "the Sunday prior to hospitalization." Ex. 27 at ¶3. "The incident lasted only one day" and he had no symptoms by the following day. *Id.* Though the record indicates that Petitioner vomited ten days prior to his GBS onset on February 14, 2019, Petitioner asserted that he distinctly remembered suffering from nausea and vomiting four days prior to his hospitalization. *Id.* ¶6.

Regarding his second episode of GBS, Petitioner stated, "I experienced all of the same issues that I had in 2017. The pain in my legs was severe, rating at a '9' or '10.' I was again incontinent of my bowel and bladder." ECF No. 36-1 ¶42. He underwent hospitalization, inpatient rehabilitation, physical therapy, plasma exchange, and IVIG. *Id.* ¶¶37-48. Petitioner was able to walk with a cane at the end of 2019 and exercise in a pool by January of 2020. *Id.* ¶¶52-53. He again felt another episode of severe pain and inability to move his legs in June of 2020. He was taken to the emergency room, administered pain medication, and discharged. *Id.* ¶54. Petitioner affirmed continuing problems with urination, balance, foot drop, both shooting pain and decreased feeling in his feet, and difficulty walking long distances. *Id.* ¶¶56-61.

Petitioner's expert, Dr. Derek Smith, opines that the Petitioner's 2019 GBS was a "continuation" of Petitioner's 2017 GBS. Ex. 24 at 2. However, Dr. Smith does little to explain how he arrives at this conclusion. Indeed, he deems the recurrence "more problematic, given the elapsed time." *Id.* But "because there were no illnesses preceding the second event, I think it is fair to say it represents a continuation of the conceded GBS as the first event likely generated long-term memory cells, a feature of cell mediated

---

[8] Based on a mapped approximation, a drive from Petitioner's home in Sturgeon Bay, WI to Wichita Fall, TX is at lead 1,100 miles, and crosses several states.

immune responses." *Id.* Dr. Smith also opines that Petitioner's vomiting prior to his 2019 GBS onset was "brief and isolated to the upper gastrointestinal tract" and thus likely "episodic vomiting not associated with infection." Ex. 28.

On the other hand, Respondent's expert, Dr. Brian Callaghan, opines that Petitioner's second bout of GBS was solely attributable to a gastrointestinal infection. Dr. Callaghan asserts the importance of antecedent events, noting that "genetic and immunologic host factors may play an important [role] in recurrent GBS, since these patients can develop similar symptoms after *different* preceding infections." Ex. A at 3 (emphasis added).[9] Dr. Callaghan further opined that antecedent events are not less common prior to a second episode of GBS. *See id.* And here, there is evidence of a likely triggering cause: Petitioner had nausea and vomiting ten days prior to his 2019 GBS onset, which Dr. Callaghan opines was the product of a gastrointestinal infection that better explained the recurrence. *Id.* at 4. "Furthermore, there is strong evidence to support and association between gastrointestinal infection and GBS…[i]n contrast, there is no evidence linking influenza vaccination with recurrent GBS 2 years later." *Id.*[10]

In light of the foregoing, the evidence does not preponderantly support a determination that Petitioner's 2019 GBS was a continuation of his 2017 GBS and/or related to the March 16, 2017 flu shot. Temporally, Petitioner's second episode occurred nearly *two years* after the subject vaccination and three months after Petitioner achieved significant recovery from his 2017 GBS – facts that from the outset undermine a connection.[11] There was sufficient time between November 2018 (when Petitioner's initial symptoms began to subside) and February 2019 for intervening factors and different antecedent events to be explanatory. Petitioner's expert's opinion is also conclusory and unsubstantiated in setting forth how the vaccine's triggering in an initial occurrence of GBS would inevitably create conditions for any and all subsequent events the Petitioner experienced – especially since GBS is well-understood to be an acute and monophasic disease.

Petitioner also argues that his GBS episodes are likely related because his treating physicians diagnosed him with recurrent GBS. But such a diagnosis does not indicate the *cause* of GBS recurrence, only that it *did* reoccur. *See* ECF No. 46 at 4; *see* Ex. 10 at

---

[9] Kuitward K, et al., *Recurrent Guillain-Barré Syndrome*, J Neurology Neurosurgery Psych 56-59 (2009) ("Kuitward").

[10] Greene S, et al., *Guillain-Barré Syndrome, Influenza Vaccination, and Antecedent Respiratory and Gastrointestinal Ingestions: A Case-Centered Analysis in the Vaccine Safety Datalink*, (2009); Galleotti F, et al. *Risk of Guillain-Barré syndrome after 2010-2011 influenza vaccination*, Eur J Epidemiology 433-44 (2013).

[11] Though Petitioner alleges otherwise in his affidavit, the medical record clearly documents an almost complete recovery by November of 2018. Ex. 20 at 440-44; Ex. 17 at 455-458.

328, 577. Dr. Collins – a neuromuscular specialist who thoroughly reviewed Petitioner's medical history, examined Petitioner, and provided an extensive report concluding that Petitioner suffered from two GBS episodes – did not indicate a cause for the second episode though he noted "nausea and vomiting about ten days prior to the onset of symptoms." Ex. 18 at 21, 25-28.

And this leads to an especially compelling factor that defeats an association between the two GBS occurrences. As established by Respondent's expert and supported by medical literature, patients suffering from recurrent GBS can have similar symptoms in each GBS episode despite *different* antecedent events - and gastrointestinal infections are well-understood to be associated with GBS. Ex. A at 3.[12] Here, there is preponderant evidence of such a trigger. Although testing was not conducted for Petitioner's possible gastrointestinal infection, Petitioner experienced multiple episodes of nausea and vomiting several days prior to his hospitalization. Dr. Callaghan's opinion persuasively linked this evidence to the 2019 GBS occurrence.

I thus will not factor in the 2019 GBS recurrence in my damages determination.

### B. Appropriate Damages

#### i. Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that Petitioner was a competent adult at all relevant times, with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's episode 2017 episode of GBS. I review the entire record, consider prior awards for pain and suffering GBS cases, and rely upon my experience adjudicating these cases.

As a preliminary matter, I do not find an award for *future* pain and suffering appropriate in this matter, nor do either of the parties suggest such an award.

This matter is otherwise straightforward. Petitioner has not presented any special circumstances (such as inability to take pain-medication, complicated surgeries, or special family circumstances that would compound pain and suffering). Petitioner received the subject flu vaccination on March 16, 2017, began experiencing symptoms on March 25, 2017, and was admitted on March 28, 2017. Ex. 2 at 1; Ex. 4 at 4; Ex. 3 at 1422. Petitioner was hospitalized for fourteen days, which included a lumbar steroid

---

[12] As noted in Kuitward, "[t]he patients with a recurrent GBS in our study showed similar signs and symptoms during every episode despite having different types of symptoms of a preceding infection." Kuitward at 58.

injection, an MRI and EMG, five days of IVIG (one round), three days of IV steroids, and catheterization. Ex. 3 at 1401-1503. Petitioner was limited to a wheelchair at discharge and placed in subacute rehabilitation for thirty-one days where he underwent physical and occupational therapy and completed a plasmapheresis regimen. He still required catheterization at this time. Ex. 5 at 106-274. Then, Petitioner entered inpatient rehabilitation for fifty-six days, where he underwent daily physical and occupational therapy, but also developed deep vein thrombosis and bilateral footdrop. At discharge, he did not need catheterization and could walk short distances with a walker. Ex. 3 at 5405-5839. Petitioner completed nineteen out-patient physical therapy sessions, and then (nine months later) completed an additional twenty-one physical therapy visits. Ex. 17 at 221-229, 234-455. By November 6, 2018, Petitioner felt "very much improved" – he could walk without an assistive device, had limited to no pain, had increased endurance, and regained 4/5-5/5 strength in his legs. Ex. 455-458. It appears that Petitioner did not see any physician for GBS symptoms after November 2018 until his second episode that began on February 14, 2019. Ex. 10 at 87. In fact, Petitioner had recovered enough to drive himself from Sturgeon Bay, Wisconsin, to Wichita Fall, Texas in November of 2018. The period of Petitioner's 2017 GBS episode, March 2017 to November 2018, is nineteen months.

The case comparisons offered by both parties are helpful, particularly the parties' discussion of *Wilson*, which resulted in a $175,000 pain and suffering award. *Wilson v. Sect'y of Health & Human Servs.*, No. 20-588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021). Petitioner submits that his case is much more severe, as Mr. Wilson regained full strength and motor function within ten months from onset. ECF No. 46 at 2-3. "Petitioner experienced more time related to his treatment for his *first* bout of Guillain-Barre Syndrome than the [Mr. Wilson's] entire course of treatment." *Id.* at 3. Respondent disagrees and submits that Petitioner's case is "roughly equivalent or only slightly worse than Mr. Wilson's." ECF No. 47 at 7.

Having laid out Petitioner's course above, I find that Respondent's position has some merit. Petitioner's course (March 2017 to November 2018) was certainly longer than Mr. Wilson's ten-month recovery. However, Petitioner's GBS recovery may have been stalled for approximately nine months (November 2017 to August 2018), during which he only saw his PCP once on March 23, 2018. Furthermore, Petitioner was not intubated and did not require a feeding tube, as Mr. Wilson did. *Wilson,* 2021 WL 5143925 at *2. On the other hand, Petitioner was treated with IVIG, IV steroids, and plasmapheresis, was admitted to subacute rehabilitation in addition to inpatient rehabilitation, and experienced complications such as deep vein thrombosis. Thus, Petitioner's recovery appears to have been longer and more complicated than referenced cases that resulted in $175,000-$180,000 for pain and suffering.

As I have noted in prior damages decisions, GBS is a serious and frightening vaccine injury, and a pain and suffering award for this specific injury should be calculated with that in mind. Petitioner endured catheterization, being wheelchair bound for several weeks, several weeks of inpatient rehabilitation, and several months of physical and occupational therapy. Even when Petitioner finished physical therapy in November of 2018, he did not appear to have complete 5/5 strength (4/5 strength for certain muscle movements) *See* Ex. 17 at 455-458. For these reasons, I find that **$192,500.00** in total compensation for actual pain and suffering is reasonable and appropriate in this case.

### ii.  Other Damages Components

The parties disagree about the amount for Petitioner's unreimbursed expenses. As I have found that the compensable injury is limited to Petitioner's 2017 GBS episode, the unreimbursed expenses must also be limited to this period. Petitioner requests $4,738.13 for his 2017 episode, whereas Respondent submits that $3,280.92 is the proper amount. ECF No. 36 at 1,5; ECF No. 38 at 16.

Based on the documentation submitted by Petitioner at ECF No. 36-2 and ECF No. 36-3 ("Ex. 23"), only part of this component of the request can be awarded. Some of the appointments and visits were unrelated to Petitioner's GBS care. *See* Ex. 23 at 150-54, 232-34. Petitioner also seeks compensation for the cost of medications he was already taking prior to his 2017 GBS. *See* Ex. 16 at 34, 256; *see* ECF No. 36-2 at 4-5.

As such, a deduction of $593.66 (unrelated appointments) and $107.32 (prior medications) is made to Petitioner's request of $4,738.13. I award Petitioner $4,037.15 for unreimbursed expenses and include it in the total award. And as I do not find Petitioner's later GBS compensable, future medical costs associated with treatment flowing from that event are also not compensable.

### Conclusion

For the reasons discussed above and based on consideration of the record as a whole, **I find that $192,500.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[13] I also award Petitioner $4,037.15 for unreimbursed expenses.**

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

Based on the record as a whole and arguments of the parties, **I award a lump sum payment of $<u>196,537.15</u> in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.